**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **BANK ONE, N.A.,** | : |
| | : |
| | : |
| **Plaintiff,** | :   **Case No. 04-CV-318** |
| | : |
| **v.** | : |
| | :   **JUDGE MARBLEY** |
| **ECHO ACCEPTANCE** | : |
| **CORPORATION,** *et. al.*, | :   **Magistrate Judge King** |
| | : |
| **Defendants.** | : |

**OPINION & ORDER**

**I.  INTRODUCTION**

This matter is before the Court on Defendants' Motion for Summary Judgment.  Plaintiff

Bank One brought a breach-of-contract action against Defendants Echo Acceptance Corporation

("EAC") and EchoStar Communications Corporation ("ECC") (collectively "Defendants")

seeking indemnification of $13 million in damages, legal costs, and expenses that Bank One paid

to settle a 1998 class action.  For the reasons set forth below, the Court **DENIES** Defendants'

Motion for Summary Judgment.

**II.  BACKGROUND**

On August 24, 1994, Bank One and EAC entered into a Private Label Revolving Credit

Plan Agreement (the "Credit Agreement") through which Bank One provided financing for

EAC's satellite-dish customers.  Under the agreement, EAC sold home satellite systems and

offered its customers a Bank One credit card to finance the purchase.  The credit card bore the

name of both Bank One and EAC.  Because EAC's sales force explained the terms and conditions of the financing to satellite purchasers, Bank One insisted on a broad indemnification clause in the Credit Agreement to protect itself against any misrepresentations by EAC's dealers. Thus, the Credit Agreement included the following paragraph:

> EAC agrees to indemnify Bank One and to hold Bank One harmless from and against any and all actions, lawsuits, complaints, liabilities, claims, damages and expenses (including, without limitation, reasonable fees and disbursements of counsel) suffered, sustained, incurred, paid, or required to be paid by Bank One, whether filed or claimed by consumers or instrumentalities of the federal or state governments, arising out of or resulting from (i) the breach, incorrectness, or incompleteness of any representation, warranty, or covenant made by EAC in this Agreement or in any other instrument delivered pursuant hereto; (ii) its actions under the Plan and in conducting its business; (iii) any failure on EAC's part to comply with any local, state or federal statute, law or regulation with regard to the validity and legality of EAC's business; (iv) any and all aspects of EAC's business including, but not limited to, the selection, use and operation of sales agreements used in conjunction with a transaction with cardholders . . . This indemnity shall not apply to any actions of EAC taken at the request of Bank One, or to any action following approval by, or at the direction of Bank One.

Credit Agreement § 23(A).  In addition, Bank One protected its interests by contracting with ECC, EAC's parent company, to guarantee EAC's performance of the indemnity provision.  Bank One had an identical arrangement with two other home satellite distributors, Consumer Satellite Systems ("CSS") and Home Cable Concepts ("HCC").

In 1998, approximately 73,000 credit-card holders, 55,000 of which had bought satellite equipment from EAC's dealers, brought a class action in Tennessee state court against Bank One arising from the financing of home satellite purchases.  Specifically, plaintiffs alleged that distributors, including EAC, used deceptive, fraudulent, and misleading sales tactics to encourage customers to purchase home satellite equipment

with Bank One's financing.  But plaintiffs did not name either EAC, ECC, or any of their

subsidiaries as defendants in the class action.

Rather, plaintiffs in *Hunter* imputed EAC's actions to Bank One on a theory of

respondeat superior liability and brought the following claims: negligent investigation of

consumer complaints, negligent monitoring of sales, negligent design of a financial

product, negligent implementation and monitoring of financial product, negligent

supervision and training of sales agents, and unjust enrichment.  (Third Am. Class Action

Compl.) (*"*Third Amended Complaint").  The *Hunter* court certified these claims on

October 9, 2001.  (Order of Final Class Certification).

Bank One, believing that the *Hunter* class action arose in part from EAC's breach

of the Credit Agreement's covenant prohibiting deceptive sales practices,[1] demanded

indemnification from EAC on five occasions.  EAC refused Bank One's first request,

stating that "it does not appear that EAC owes Bank One either an obligation of defense

or indemnity on the claims being made against Bank One in Tennessee."  Letter from T.

Wade Welch to David Carpenter (June 10, 1998).  EAC ignored Bank One's subsequent

requests for indemnification and invitations to participate in the settlement process.

On July 19, 2002, Bank One entered into a settlement agreement under which it

promised to pay up to $26 million in damages to approximately 73,000 class members,

including $8.5 million in attorney's fees and $300,000 in various legal expenses.  Thus

far, Bank One has made approximately $13 million in payments, including $3.5 million

---

[1] A covenant in the Credit Agreement states, "EAC . . . shall not coerce customers or
pursue any deceptive practices in soliciting accounts." Credit Agreement § 3(D).

in settlement payments to class members, $8.8 million in plaintiffs' fees and expenses, and $500,000 for its own legal fees.  Bank One is now demanding indemnification from EAC for all funds paid.

On March 12, 2003, Bank One filed this case in the Franklin County Common Pleas Court, alleging that Defendants breached their duty to indemnify Bank One. Defendants removed the case to this Court based on diversity jurisdiction.  Defendants have moved for summary judgment on the grounds that the Credit Agreement does not entitle Bank One to indemnification for the *Hunter* settlement.

### III.  STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  But "summary judgment will not lie if the. . . evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 248.  Therefore, the movant has the burden of establishing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  But the non-moving party "may not rest upon its mere allegations."  Fed. R. Civ. P.56(e); *see Celotex*, 477 U.S. at 324*; Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).

The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV.  ANALYSIS

Under Ohio law,[2] in order to prevail in a breach of contract action for indemnification of a settled claim, the indemnitee must prove that: (1) it gave the indemnitor proper and timely notice of the underlying action; (2) the contract requires indemnification for all or part of the settlement; and (3) the settlement was fair and reasonable. *Globe Indemnity Co. v. Schmitt*, 53 N.E.2d 790, 794 (Ohio 1944).[3]

EAC contends that the contract does not entitle Bank One to indemnification for six reasons: (1) Bank One failed to give EAC timely and adequate notice of the *Hunter* class action; (2) Bank One failed to obtain EAC's written consent to the settlement agreement; (3) the *Hunter* class action arose from Bank One's negligent and intentional acts, for which EAC is not liable under the indemnity provision; (4) the *Hunter* settlement failed to disaggregate EAC's liability from that of other distributors and that of Bank One; (5) the indemnification obligation did not survive the expiration of the contract; and (6) the settlement did not extinguish the *Hunter* plaintiffs' claims against EAC.

---

[2]The Credit Agreement stipulates that any breach of contract action must be litigated under Ohio law.  Credit Agreement § 35(B).

[3]This Court notes that an insurance policy and an indemnity agreement are analogous for the purposes of this case.

## A.  NOTICE

EAC contends that Bank One did not give it proper notice of the *Hunter* class

action.  Both the Credit Agreement and Ohio law require prompt, written notice as a

condition precedent of indemnification.[4]  *See McLin v. Leigh*, 598 N.E.2d 731, 740 (Ohio

Ct. App. 1991).  Under Ohio law, notice must be delivered "within a reasonable time in

light of all the surrounding facts and circumstances."  *American Employers Ins. Co. v.*

*Metro Regional Transit Authority*, 12 F.3d 591, 597 (6th Cir. 1993) (*citing Ruby v.*

*Midwestern Indemn. Co.*, 532 N.E.2d 730, 732 (Ohio 1988)).  Prompt notice is required

so that an indemnitor has a meaningful opportunity to investigate the claim, to determine

the applicability of the indemnity provision, to join and control potential litigation, and

otherwise to protect its interests.  *See Ormet Primary Aluminum Corp. v. Employers Ins.*

*of Wausau*, 725 N.E.2d 646, 655 (Ohio 2000); *see also Ruby*, 532 N.E.2d at 732

(articulating the rationale for notice in the indemnification context).

The *Hunter* plaintiffs served Bank One with the original complaint on March 3,

1998.  Five weeks later, on May 5, 1998, Bank One notified EAC of the *Hunter* class

action and requested indemnification for any attendant liability.  Bank One attached the

original complaint and the preliminary motion for class certification to this

correspondence.  EAC contests the adequacy of this notice on two grounds.  First, EAC

contends that Bank One's duty to notify EAC arose when Bank One first learned of the

possibility of a lawsuit in June 1997.  Second, EAC argues that the May 5, 1998 letter did

---

[4]Section 23(C) of the Credit Agreement provides: "[e]ach party agrees to give prompt
and written notice to the indemnifying party of any third-party claim, action or proceeding as to
which it may request indemnification hereunder."

not reasonably alert EAC to any potential claim for indemnification arising out of the *Hunter* class action.

### 1.  Duty to Notify

EAC contends that Bank One's duty to notify it of a claim for indemnification arose on June 18, 1997.  At this time, EAC alleges that Bank One first learned of the possibility of a lawsuit.  Under Ohio law, the "duty to notify is triggered at the time a reasonable person would have recognized the possibility of a claim." *B.F. Goodrich Co. v. Commercial Union Ins. Co.*, No. 1999 02 0410, 2001 WL 1692410, at *4 (Ohio Ct. Com. Pl. Dec. 19, 2001) (*reversed on other grounds by B.F. Goodrich Co. v. Commercial Union Ins.*, No. 20936, 2002 WL 31114948, at *2 (Ohio Ct. App. Sept. 25, 2002) (noting that "the holder of a primary insurance policy typically has the duty to notify its insurer as soon as it realizes that it is liable for any [] costs").

EAC avers that a June 1997 letter from attorney Steve Martino to Bank One triggered Bank One's duty to notify Defendants.  Martino, who subsequently became lead plaintiffs' counsel in *Hunter*, threatened a lawsuit in an Alabama court over Bank One's financing of home satellites purchases.  To bolster his threats, Martino attached a draft complaint to his letter.  EAC contends that *Hunter* grew out of this threatened litigation.  As such, EAC argues that the June 1997 correspondence alerted Bank One to the possibility of a claim for indemnification.  Accordingly, EAC asserts that Bank One's May 1998 notice was untimely.

This argument is without merit.  According to Martino, although the threatened litigation also arose from Bank One's financing of home satellite purchases, it was

unrelated to *Hunter*.[5]  Importantly, the June 1997 letter threatened a lawsuit in a different forum and named different plaintiffs than *Hunter*.  At this time, consumer complaints arising from the sale of home satellite systems besieged Bank One and EAC.  Each claim potentially triggered EAC's duty to indemnify Bank One.  As such, Bank One's duty to notify EAC arose when it learned of the possibility of the *Hunter* class action, not an unrelated Alabama lawsuit.  The fact that the claims shared a common subject matter is irrelevant.

Equally as significant, the June 1997 correspondence merely threatened litigation. Sophisticated commercial institutions such as Bank One and EAC face the threat of lawsuits on a regular basis.  If every ephemeral threat, such as the June 1997 letter, was sufficient to trigger contractual notice obligations, insurers and indemnitors would be swamped with prodigal paperwork.  This is neither sensible nor required by Ohio law.

Rather, Bank One's duty to notify EAC arose when plaintiffs filed and served the original complaint in the *Hunter* class action on March 3, 1998.  At that time, Bank One confronted tangible claims that implicated the indemnification provision.  Bank One

---

[5]Steve Martino's Deposition provides:

Q:    But this [draft Alabama complaint] was a draft that was intended to be reviewed for Hunter - what became the Hunter litigation, right?
A:    No.  I mean no.  I don't think it had anything to do with Hunter.
Q:    But this is the litigation that you contemplated filing against Bank One, represents the claims that you would be asserting in the class action that became the Hunter litigation?
A:    No.
Q:    No?
A:    No.  I mean, the Hunter litigation was separate and apart, I mean, it stood alone at the end of the day.

(Martino Dep. 13:7 - 14:11, Mar. 14, 2007).

-8-

promptly notified EAC five weeks later. By alerting EAC in the incipient stages of the litigation, EAC had a meaningful opportunity to investigate the *Hunter* claims, to determine whether the underlying claims implicated the indemnification provision of the Credit Agreement, to intervene in the class action, and otherwise to protect its interests. *See Ormet*, 725 N.E.2d at 655. Accordingly, the Court concludes that notice was timely.[6]

## 2. Adequacy of Notice

EAC also contends that Bank One's May 5, 1998 letter was insufficient to notify EAC of potential liability arising from the *Hunter* class action. As a condition precedent for an indemnity action, Ohio law requires that the indemnitee fully and fairly inform the indemnitor of the underlying action such that the indemnitor has the opportunity to defend or participate in the defense. *Maryland Cas. Co. v. Frederick Co.,* 53 N.E.2d 795, 799 (Ohio 1944). It is undisputed that Bank One's May 5, 1998 correspondence notified EAC of the *Hunter* class action, demanded indemnification, and enclosed a copy of the original complaint and the preliminary order of class certification.

EAC counters that the original complaint was insufficient to constitute proper notice because it failed even to mention EAC, either as a defendant or in the factual allegations. Nor did the original complaint refer, by name, to any of EAC's customers. The only distributor mentioned in the complaint was HCC. Consequently, EAC contends

---

[6]Where reasonable people can differ as to whether plaintiff gave notice within a reasonable time, the timeliness of notice is a question for determination by a jury. *American Employers Ins. Co. v. Metro Regional Transit Authority*, 12 F.3d 591, 598 (6th Cir. 1994); *see also Employers Liability Assurance Corp. v. Rhoem*, 124 N.E. 223 (Ohio 1919) (holding that while notice is the essence of contract, there can be situations in which it is for the jury to say whether plaintiff complied with the notice provision). This is no such case. The Court holds that Bank One's notice was prompt and reasonable as a matter of law.

that it reasonably believed that *Hunter* arose out of HCC's sale of home satellite systems and Bank One's arrangement with HCC to finance the purchases.

In fact, the *Hunter* plaintiffs did not mention EAC until the Third Amended Complaint, filed April 2, 2002, which Bank One admittedly failed to send to EAC until well after the settlement agreement.  EAC argues that since the original complaint did not implicate EAC, ECC, or any of their customers, and Bank One failed to transmit the Third Amended Complaint, Bank One failed to give full and fair notice.  EAC concludes that without proper notice, it has no contractual obligation to indemnify Bank One.

But EAC's argument is specious.  The original complaint was sufficient to put any reasonable party in EAC's position on notice of its potential duty to indemnify Bank One.  The complaint stated that Bank One's liability in the *Hunter* class action arose, in part if not in totality, out of fraud and misrepresentation by Bank One's national network of distributors, which included EAC.  If true, this would plainly violate the Credit Agreement, in which EAC covenanted to refrain from deceptive sales practices.  The original complaint stated:

> [i]n order to induce potential satellite purchasers to purchase and finance home satellite systems, Bank One, *through its agents, representatives, Private Label Distributors and local salesmen*, uses deceptive, fraudulent and/or misleading sales tactics, contracts, advertising, and promotional practices designed to conceal its practice of establishing and procuring credit card accounts and arranging deficient and/or substandard minimum payment plans unbeknownst and at the detriment of the satellite purchaser.

(Original Class Action Compl. ¶ 10) (emphasis added).  The complaint is replete with similar allegations that distributors, such as EAC, used deceptive, fraudulent, and misleading sales tactics to encourage customers to purchase satellite equipment with

-10-

Bank One's financing.[7]  This was sufficient to put any distributor, including EAC, on notice that Bank One would seek indemnification for the damages arising from the *Hunter* class action.

That the original complaint failed explicitly to mention EAC is irrelevant. Although the named plaintiffs purchased their satellite system through HCC, the complaint did not limit the class to HCC customers.  Instead, the complaint contemplated a nationwide class action, potentially including any consumer that purchased a home satellite system through Bank One's financing.  The putative class included all buyers who may have been misled at the point of sale about the terms and conditions of Bank One's financing plan, regardless of the distributor.

Most importantly, Bank One explicitly demanded indemnification for *Hunter* in its May 5, 1998 letter to EAC.  The crux of the notice inquiry is not whether EAC is liable for the underlying claims but whether Bank One notified EAC of its intent to seek indemnification.  It may be too obvious to belabor, but Bank One's demand for

---

[7]The Original Complaint also provides:

> Due to the distributors and program providers referring to themselves as cable companies, most consumers were unaware they were actually purchasing satellite dish and receiver equipment on an open ended revolving credit account.  The consumers were *quoted* monthly payments of $45 to $60 - competitive with the local standard cable providers monthly fees - for a total of five (5) years.  Furthermore, unbeknownst to the majority of consumers, credit card applications were actually completed and signed by them under the premise and disguise of a purchase order.  (¶ 21).
> . . .
> Upon each and every instance Defendant's agents failure to disclose such information, Defendant knew or should have known that the information which was not disclosed was material to the Plaintiffs and Class Members in their decision of financing of a home satellite system.  (¶ 24).

-11-

indemnification for *Hunter* is sufficient, in and of itself, to put EAC on notice that it may have to indemnify Bank One. Accordingly, Bank One's May 5, 1998 letter, accompanied by the original complaint, fully and fairly notified EAC of its potential liability to Bank One for the underlying class action.

## B. WRITTEN CONSENT

EAC contends that Bank One failed to obtain its written consent to the *Hunter* settlement, which pursuant to the Credit Agreement, is a condition precedent of indemnification.[8] Bank One counters that EAC repudiated its obligation to indemnify Bank One for *Hunter* and consistently ignored Bank One's invitations to participate in settlement talks. As such, Bank One was not obligated to obtain EAC's written consent to the settlement agreement.

Ohio courts have held that when a party "repudiates a contract before the occurrence of a condition precedent to the party's performance, the adverse party may treat the entire contract as broken and sue for breach of contract, and there is no necessity in such cases for . . . compliance with conditions precedent." *Alpha Telecommunications, Inc. v. Int'l Business Machines Corp.*, 194 Fed.Appx. 385, 389 (6th Cir. 2006) (*citing Livi Steel, Inc. v. Bank One*, 584 N.E.2d 1267, 1270 (1989)); *see also Corbin on*

_____

[8]Section 23(C) of the Credit Agreement provides:

> Neither the indemnifiying party nor the indemnified party shall settle or compromise any such third-party claim, action or proceeding without the prior written consent of the other which consent shall not be unreasonably withheld.

*Contracts* § 959 (interim ed. 2002) (discussing anticipatory repudiation).[9]  But

repudiation must be clear and unequivocal.  *Automated Solutions Corp. v. Paragon Data

Sys., Inc.*, 856 N.E.2d 1008, 1018 (Ohio Ct. App. 2006); *see also McDonald v. Bedford

Datsun* 570 N.E.2d 299 (Ohio Ct. App. 1989).  Here, the issue is whether EAC

repudiated its obligation to indemnify Bank One, relieving Bank One of the duty to

obtain EAC's consent to the settlement agreement.

Bank One requested indemnification for *Hunter* in the May 5, 1998 letter.  EAC

rejected Bank One's request, stating that "it does not appear that EAC owes Bank One

either an obligation of defense or indemnity on the claims being made against Bank One

in Tennessee."  Letter from T. Wade Welch to David Carpenter (June 10, 1998).

Subsequently, on four separate occasions, Bank One notified EAC of ongoing settlement

negotiations and requested indemnification.  EAC never responded.[10]

EAC claims that it was never aware of any potential duty to indemnify Bank One

for *Hunter* until after the parties reached a settlement agreement in December 2001.  But

as discussed above, Bank One promptly notified EAC of the class action and requested

---

[9]Corbin on Contracts, § 959 (interim ed. 2002), notes:

> It is now the generally prevailing rule in both England and the United States
> that a definite and unconditional repudiation of the contract by a party
> thereto, communicated to the other, is a breach of the contract, creating an
> immediate right of action and other legal effects, even though it takes place
> long before the time prescribed for the promised performance and before
> conditions specified in the promise have ever occurred.

[10]EAC replied once, in a letter dated March 16, 2001, stating that EAC was confused by
Bank One's request.  Bank One replied on March 27, 2001, reiterating its demand for
indemnification and notifying EAC of continuing settlement negotiations in which EAC, by
right, was invited to participate.  EAC never replied.

indemnification in the May 5, 1998 letter.  This notice was timely, full, and fair.  If EAC was confused, it had ample opportunity to contact the *Hunter* plaintiffs or Bank One in order to clarify its seemingly evident obligations.

EAC also argues that Bank One intentionally expanded the scope of the *Hunter* class action to include EAC's customers and failed to notify it of this development.  But this argument is similarly meritless.  The original complaint contemplated the inclusion of EAC's customers in the putative class.  As lead plaintiffs' counsel intended and encouraged from the outset of *Hunter*, EAC's customers voluntarily joined the class action.  Bank One did not secretly expand the class to include EAC's customers.  EAC's purported ignorance of the scope and nature of the *Hunter* class action is insufficient, at this late hour, to bar indemnification.

Once EAC rejected Bank One's initial demand for indemnification and repeatedly ignored its invitation to participate in the settlement process, Ohio law no longer required Bank One to obtain EAC's written consent to the settlement agreement.  In *Bakos v. Insura Prop. & Cas. Ins. Co.*, 709 N.E.2d 175, 181 (Ohio Ct. App. 1997), the court absolved indemnitees in Bank One's position from the futility of repeatedly pleading for consent to a settlement, noting that "it is unreasonable to require that an [indemnitee] notify its [indemnitor] of a proposed settlement after the [indemnitor] has already informed the [indemnitee] that it would not provide coverage pursuant to the [contract]."

It is "disingenuous, at best, for [the indemnitor] to deny coverage to [the indemnitee] and then claim that he was, nevertheless, required to comply with the

requirements in his [indemnification provision]." *Sanderson v. Ohio Edison Co.*, 635 N.E.2d 19, 21 (Ohio 1994). Rather, "by abandoning the insureds to their own devices in resolving the suit, the insurer voluntarily forgoes the right to control the litigation and, consequently, will not be heard to complain concerning the resolution of the action in the absence of a showing of fraud." *Id.* (*quoting Gen. Acc. Ins. Co. v. Ins. Co. of N. Am.*, 540 N.E.2d 266, 271 (Ohio 1999)).

The original *Hunter* complaint alleged that distributors, such as EAC, used deceptive, fraudulent, and misleading sales tactics to encourage customers to purchase satellite equipment with Bank One's financing. These allegations self-evidently implicated the indemnification provision. As such, EAC was on notice from May 5, 1998, that it might have to indemnify Bank One for part of the damages arising from *Hunter*. By rejecting Bank One's request for indemnification, and consistently ignoring Bank One's invitations to participate in settlement negotiations, EAC forfeited its right to approve the settlement.

### C. LIABILITY FOR THE UNDERLYING CLAIMS

EAC disputes its liability for the underlying claims. Ohio law provides that "[t]he duty to indemnify arises when there is, in fact coverage." *Reliable Springs v. St. Paul Fire and Marine Ins. Co.*, 869 F.2d 993, 994 (6th Cir. 1989) (*quoting Riverside Insurance Co. v. Wiland*, 474 N.E.2d 371 (Ohio 1984)). Although many jurisdictions have lowered an indemnitee's burden of proof on summary judgment, such that Bank One would only have to show that it was *potentially* covered for the acts in the underlying suit, Ohio law still requires the indemnitee to show that it would have *actually*

been covered.  *See Chemstress Consultant v. Cincinnati Ins. Co.*, 715 N.E.2d 208, 212

(Ohio Ct. App. 1998).

      Had *Hunter* been decided on the merits, this Court would only have to review the

factual findings to determine whether EAC has a duty to indemnify Bank One for the

underlying claims.  *See Wiland*, 474 N.E. at 375.  But because the claims settled, the

Court must look to the "basis of the settlement."  *Travelers Ins. Co. v. Waltham Indus.

Labs. Corp.*, 883 F.2d 1092, 1099 (1st Cir. 1989).  To do so, the Court cannot merely rely

on the pleadings.  *Erie Ins. Exch. v. Colony Dev. Corp.*, Nos. 00AP-1334, 00AP-1335,

2001 WL 641144 at *4 (Ohio Ct. App. June 12, 2001).  Rather, the Court must look to

the "terms and circumstances" of the underlying settlement, including relevant affidavits,

depositions, and documentary evidence.  *M/G Transport Svcs. v. Water Quality Ins.,* 234

F.3d 974, 978 (6th Cir. 2000).[11]

      Accordingly, to survive summary judgment, Bank One must proffer sufficient

facts to show that EAC has a contractual duty to indemnify it for the *Hunter* settlement.

*See Blair v. Mann*, No. 98-CA35, 1999 WL 228265, at *2 (Ohio Ct. App. Apr. 8, 1999).

EAC contests its liability for the underlying claims on two grounds.  First, EAC disputes

Bank One's construction of the indemnification clause.  Second, EAC contends that

---

    [11]There is yet no test under Ohio law for determining what this Court should review to
determine whether *Hunter* arose from Defendants' actions; however, *M/G Transport Svcs. v.
Water Quality Ins.,* 234 F.3d 974 (6th Cir. 2000) is instructive.  In *M/G Transport*, after paying
$4.5 million in settlement costs, plaintiff sued its insurer under a contract providing for
indemnification for claims arising under the Clean Water Act.  To determine whether the
settlement triggered the indemnification provision, the Sixth Circuit looked to the "terms and
circumstances" of the underlying settlement.  *Id*. at 978.

regardless of the interpretation of the contract, it has no duty to indemnify Bank One

because *Hunter* arose solely from Bank One's negligent or intentional acts.

### 1. Interpreting the Indemnification Provision

The parties offer competing constructions of the indemnification clause.  EAC construes the contract such that Bank is not entitled to indemnification if it was contributorily negligent in *Hunter*.  By contrast, Bank One construes the Credit Agreement such that EAC has a duty to indemnify Bank One for any and all judgments arising from the sale of home satellite systems, including for judgments resulting in part or in totality from Bank One's negligence.  Both constructions are meritless.  Both ignore the plain and ordinary meaning of the contract.

EAC construes the Credit Agreement to create a traditional contributory negligence regime whereby EAC is under no obligation to indemnify Bank One for the *Hunter* settlement if Bank One was at all liable for the underlying claims.  Regardless of the degree of EAC's culpability, EAC argues that the Credit Agreement bars indemnification so long as Bank One was contributorily negligent in *Hunter*.  This interpretation is groundless.

The indemnification provision of the Credit Agreement is unambiguous. Therefore, under Ohio law, the Court must give the terms of the contract their plain and ordinary meaning.  *St. Mary's Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 992 (6th Cir. 2003) (*citing Nationwide Mut. Fire Ins. v. Guman Bros.*, 652 N.E.2d 684, 686 (Ohio 1995)).  EAC agreed to indemnify Bank One for "any and all actions . . . arising out of or resulting from the breach . . . of any . . . covenant made by EAC in this Agreement."  Credit Agreement § 23(A).  EAC specifically covenanted not to "coerce customers or pursue any deceptive practices in soliciting accounts."  Credit Agreement § 3D.  EAC also agreed to indemnify Bank One for any and all actions arising from

-18-

"failure on EAC's part to comply with any local, state or federal statute, law or regulation . . ." Credit Agreement § 23(A).

Admittedly, the contract includes several caveats.  First, the "indemnity shall not apply to any actions of EAC taken at the request of Bank One, or to any action following approval by, or at the direction of, Bank One."  Credit Agreement § 23(A).  Nor does the agreement require indemnification for Bank One's negligent or intentional acts.  Credit Agreement § 23(B).  But contrary to EAC's construction, the Credit Agreement in no way holds EAC completely harmless so long as Bank One is contributorily negligent for the underlying claims.  The contract is clear: to the extent that liability arises from EAC's negligent or intentional acts, Bank One is entitled to indemnification.

But Bank One is also in error.  Bank One construes the Credit Agreement such that EAC is obligated to indemnify it for any and all judgments arising from the sale of home satellite equipment, including judgments arising from Bank One's negligent or intentional acts.  Under Ohio law, Bank One could have contracted such that EAC would be obligated to indemnify Bank One for judgments arising from Bank One's negligence. *See St. Paul v. Munoz*, No. L-84-197, 1985 WL 8363, at *3 (Ohio Ct. App. Jan. 4, 1985).  Where the parties "are commercial enterprises of sufficient size and quality as to presumably possess a high degree of sophistication in matters of contract," *Glaspell v. Ohio Edison Co.*, 505 N.E.2d 264, 267 (Ohio 1987), Ohio law permits contracts that hold an indemnitee harmless for its own negligence.  *Coulter v. Dayton Power & Light Co.*, 731 N.E.2d 1172, 1175 (Ohio Ct. App. 1999).  But Bank One and EAC did not so contract.

Rather, the Credit Agreement includes mirror-image indemnification provisions. Bank One, copying the language from EAC's indemnification provision, agreed to indemnify EAC for "any and all actions . . . arising out of or resulting from the breach . . . of any . . . covenant made by Bank One in this Agreement." Credit Agreement § 23(B). Therefore, even a cursory reading of the Credit Agreement reveals that the contract does not relieve Bank One of liability for its misconduct.

The effect of the mirror-image indemnification provisions is to create a comparative fault regime. In other words, each party bargained to internalize the costs of its own misconduct. To the extent EAC is liable for the underlying claims in *Hunter*, it must indemnify Bank One. But Bank One may not seek indemnification from EAC for damages arising from its own misconduct. Ultimately, the Credit Agreement assigns liability where it falls, calibrating damages according to the relative fault of each party.

### 2. EAC's Liability in Hunter

Regardless of the construction of the contract, EAC denies any liability for *Hunter*. EAC contends that *Hunter* arose solely from Bank One's misconduct.[12] As evidence of Bank One's negligence, EAC highlights the Third Amended Complaint, which alleges the following claims against Bank One: (1) negligent investigation; (2) negligent monitoring of sales force; (3) negligent design of a financial product; (4) negligent implementation and monitoring of a financial product; (5) negligent supervision and training of sales agents; and (6) money had and received. As such, EAC

---

[12]This section addresses whether EAC is at all liable for *Hunter*. The next section addresses how the Court must determine the percentage of the settlement for which EAC must indemnify Bank One.

argues that *Hunter* arose from Bank One's negligent and intentional acts, negating any duty EAC might otherwise have to indemnify Bank One.

The record does not support EAC's contention. Rather, the evidence suggests that EAC is substantially, if not totally, liable for its pro rata share of *Hunter*.[13]  In conjunction with the sale of home satellite equipment, EAC's dealers and salespersons offered, explained, and arranged the financing.  If a customer financed the purchase, EAC processed the information and forwarded the credit application to Bank One.  If Bank One approved the credit application, it released the funds to EAC, which in turn, would send the proceeds to its dealers.

Bank One did not have any direct contact with buyers until they started making monthly payments on their credit cards.  As such, it was incumbent upon EAC to fairly and accurately communicate to buyers the loan repayment schedule, applicable interest rates, and their future responsibilities under the credit arrangement.  Since Bank One had no contact with buyers at the point of sale, it was liable under agency theory for any misrepresentations by EAC's dealers.  Thus, Bank One insisted on the indemnification provision to insulate itself from judgments arising from dealer misconduct.

The theory of the *Hunter* class action was straightforward: EAC's dealers lured customers into financing their purchase of satellite equipment and programming through an open-ended credit account when the buyers believed that they were enrolling in a closed-ended credit program.  An open-ended credit account is a credit account in which

---

[13]EAC's customers made up 79.5% of the *Hunter* class.  HCC and CSS customers make up the balance.  Thus, Bank One is suing EAC for indemnification of 79.5%, its pro rata share, of the settlement.

the creditor has a reasonable expectation of repeated transactions, stipulates the terms of those transactions, and provides for a finance charge that may be computed periodically on any outstanding balance.  Credit cards are one example.  By comparison, a closed-ended credit account is credit which is to be repaid in full, along with any interest and finance charges, by a specified future date.  Most real property, auto, and equipment loans are closed-ended.

The *Hunter* plaintiffs alleged that EAC conveyed the financing to buyers as a closed-ended loan.  Buyers believed that they were financing the satellite system like they would a car: borrowing a fixed amount of money to be repaid at a specific future date.  EAC's dealers promised easy monthly payments of $39, $49, or $59 per month for five years.  After which, the dealers assured, the buyer would own the satellite equipment.  But this was not the case.

Instead, EAC's dealers allegedly duped customers into unwittingly financing the purchase with a Bank One/EAC credit card at an annual interest rate of 15.9% - 18.9%.  Buyers were none the wiser because dealers led them to believe that they were signing a purchase order when in fact they were filling out a credit-card application.  Although buyers thought that their monthly payments were going toward ownership of the satellite equipment, in truth, they were merely paying interest on credit-card debt.  With payments of $49 per month, it would take twenty-two years for the buyer to pay off a satellite dish, not five years as EAC's dealers promised.  Bank One's liability for *Hunter* arose because it was liable for EAC's actions under a theory of respondeat superior.

Steve Martino, lead counsel for the class, confirms that *Hunter* arose from fraud and misrepresentations at the point of sale by EAC and other distributors.  Martino is the

authority on *Hunter*.   As class counsel, he developed plaintiffs' theory of the case, marshaled the evidence, took depositions, and negotiated the settlement.  According to Martino, although Bank One was liable on a theory of respondeat superior, both liability and damages flowed from misrepresentations by distributors such as EAC:

> Q:     What kind of evidence did you uncover that you would have presented at trial in the *Hunter* case regarding misrepresentations?
>
> A:     The largest - - the biggest lie - - you know, the **big lie** that really injured the plaintiffs in this case, and really any other satellite cases, was that the sales guy would come in there and he would say, "Ms. Jones, you can get - - you, everybody else is getting cable, this is a better deal than cable.  We'll put the satellite dish up and you get this dish for $49 a month for four years."  When, in truth and fact, at $49 a month, the $3,200 satellite dish would take twenty-two years. . . to pay off.
>
> Q:     So the big lie, as you describe it, by the Echo Star sales force and the other distributor sales force to present the financing as if it was closed end?
>
> A:     Yes, sir.

(Martino Dep, 108:25 - 109:19, Mar. 14, 2007).[14]  The weight of the circumstantial evidence corroborates Martino's account.

The Attorneys General of four states lodged numerous complaints with Bank One alleging fraud at the point of sale.  For example, the Attorney General of West Virginia

---

[14]Martino reiterated:

> Q:     And in the original complaint, what specifically were you referring to with respect to deceptive sales practices by Echostar and its sales force?
>
> A:     The main, the big lie, you know, the thing that we saw over and over again. . . the big lie is . . . making the transaction at the point of sale appear to be a closed end one.

(Martino Dep., 119:23 - 120:9, Mar. 14, 2007).

accused Bank One's distributors of "material misrepresentations of the terms and conditions of financing, both in its advertising and during its initial sales presentations to consumers." (Assurance of Discontinuance between Bank One & Atty. Gen. of W.V., June 6, 1996). The Attorneys General of Kansas, Florida, and Arkansas leveled similar accusations.

The record is also replete with the affidavits of class members alleging that EAC's dealers misrepresented the financing. The affidavit of Jennifer Mitchell is representative of the class: "I feel I was misled by misrepresentations made by [EAC] salespersons about the cost of the satellite dish." (Mitchell Aff. 1).[15] Martino noted that he could have relied on over two hundred witnesses to testify at the *Hunter* trial to similar lies by EAC and other satellite distributors. Even EAC's former President, James DeFanco, admitted that EAC's dealers committed fraud.[16] Faced with such evidence, EAC makes four counter-arguments: (1) Bank One authorized the misrepresentations; (2) *Hunter* arose from Bank One's negligent supervision and monitoring of the dealers; (3) *Hunter* arose from Bank One's negligent design of the financing plan; and (4) the theory of damages exonerates EAC.

_____

[15]For example, EAC customer Joel Gunnels testified: "after paying the monthly amount I was quoted by the salesperson for a number of months, I became aware that my balance was not reducing as promised." (Gunnel Aff. 1).

[16]DeFranco's Deposition provides:

> Q:    During the course of Echo's relationship with Bank One, were there
>       instances where Echo's dealers committed fraud?
>
> A:    I think so.

(DeFranco Dep., 70:12-70:15, Feb. 20, 2007).

### i.  Actual vs. Apparent Authority

EAC contends that even if *Hunter* arose from the representations of its dealers, it has no duty to indemnify Bank One because its dealers acted with Bank One's authorization and approval.  As evidence, EAC cites the Third Amended Complaint, which states:

> [w]henever it is alleged that Defendant, Bank One, did any act or thing, it is alleged that such Defendants' officers, agents, servants, employees, attorneys, or representatives did such act or thing and that, at the time such act or thing was done, it was done with *full express, implied, or apparent authorization or ratification* of the Defendant.

(¶ 4)(emphasis added).  Pursuant to the Credit Agreement, EAC need not indemnify Bank One for "any action . . . taken at the request of Bank One, or to any action following approval by, or at the direction of, Bank One."  Credit Agreement § 23(A).  Thus, if Bank One authorized the misrepresentations, it is not entitled to indemnification.

EAC's argument lacks evidentiary support.  By its terms, the contract only precludes indemnification where the dealers spoke with actual authority: either at the request of Bank One, with the approval of Bank One, or at the direction of Bank One. But Bank One is entitled to indemnification where the dealers acted only with *apparent* authority.  By virtue of their exclusive contact with buyers at the point of sale, EAC's dealers always spoke with apparent authority when communicating the terms of Bank One's financing.

EAC proffers no evidence to suggest that Bank One conveyed actual authority to misrepresent its financial product.  Instead of conferring actual authority, Bank One complained to EAC about rising allegations of fraud and directed it to terminate unscrupulous dealerships.  In response to six consumer complaints alleging

misrepresentations by Atlantic Satellite, EAC's dealer, Bank One wrote to EAC to
"strongly recommend[] that EchoStar remove Atlantic Satellite from the Bank One
financing program as soon as possible." Letter from Dolbeer to DeFranco (June 28,
1996). EAC refused. This incident is indicative that while EAC's dealers
misrepresented the financing with apparent authority, Bank One never authorized the
fraud. Without evidence of actual authorization, EAC's argument fails.

<u>ii. Negligent Monitoring, Supervision, & Training</u>

Second, EAC alleges that *Hunter* arose from Bank One's failure to monitor,
supervise, and train its dealers and salespersons. The body of evidence, however,
indicates that *Hunter* arose from EAC's failure to monitor, supervise, and train its dealers
and salespersons to disclose the terms and conditions of the financing truthfully. Bank
One was merely vicariously liable for EAC's failure.

Martino explained the basis for the negligent monitoring and supervision claims:

A:      . . . And I can say without - - I never talked to anyone who wasn't
        lied to at the point of sale. The largest percentage of the lies were
        around a fixed amount of money per month for a fixed amount of
        time in the financing. But in addition to that, there lies about when
        you, you know, how much programming they would get, if they were
        going to be able to use their credit card again. You know, the point
        is it was my observation at the end of the day the **distributors**,
        including **Echo Star**, would hire anybody, give them no training, put
        them on the street and say, you know, "here's your script, stick to it,
        don't answer any questions and don't get out of there without a
        signature on a contract."

(Martino Dep. 107:20 - 108:10, Mar. 14 2007) (emphasis added).

The circumstantial evidence also indicates that *Hunter* arose not from Bank One's
negligence, but from EAC's failure to train, supervise, and discipline their dealers. Early
in the venture, Bank One analyzed the mounting allegations of consumer fraud. An inter-

-26-

office memorandum concluded that 80% of the complaints arose from misrepresentations by EAC's dealers at the point of sale. Accordingly, Bank One notified EAC "of the rising number of disputes . . . that were not a function of volume but an erosion in the quality of the deal that we are receiving from the dealers." Letter from Dolbeer to Stanberry (Mar. 21, 1996). As consumer dissatisfaction grew, Bank One repeatedly demanded that EAC cut off unscrupulous dealers. The "recurring answer was no." (Schwalm Dep. 28:4 - 30:11, Sept. 28, 2006). Confronted with dealer fraud, EAC blamed the voluminous consumer complaints on buyer's remorse.

By the terms of the Credit Agreement, Bank One was at the mercy of EAC. Bank One had no contractual authority to terminate EAC's dealers or punish EAC's salespersons. Thus, Bank One insisted on a robust indemnification provision. The record demonstrates that Bank One admonished EAC to represent the financing agreement fairly and police its salesforce. Coupled with the testimony of lead plaintiffs' counsel, the Court is satisfied, for the purposes of summary judgment, that the *Hunter* claims for negligent supervision, monitoring, and training, arose from EAC's failures, not Bank One's.

### iii. Negligent Design of the Financial Product

EAC's strongest argument is that it has no duty to indemnify Bank One for any damages arising from the negligent design of Bank One's financial product. But the record suggests that the *Hunter* claims for negligent-design arose not because the financial product was per se illegal, but because it gave EAC's dealers the opportunity to misrepresent the financing.

Shortly after the plaintiffs filed *Hunter*, the Seventh Circuit, in *Benion v. Bank One*, 144 F.3d 1056 (7th Cir. 1998), held that Bank One's open-ended financial product for the sale of home satellite systems was lawful under the Truth in Lending Act.  *Benion* alerted the *Hunter* plaintiffs that the Tennessee court would probably not find Bank One's financial product to be unlawful.  As a result, according to lead counsel, the *Hunter* plaintiffs adjusted the focus of their negligent-design claim:

> Q:   [W]hen you testified about the negligent design of the financing plan as being open ended, by that did you mean that open ended design allowed an opportunity to the EchoStar salesmen and the other salesmen to make these misrepresentations to consumers on which your case was based?
>
> A:   That's one of the things.  Yes, sir.
>
> Q:   And you said earlier that the - - the big lie, as you described it, by the Echo Star sales force was that the financing was in the nature of closed end when it really wasn't. . .
>
> A:   Yeah. . ..

(Martino Dep., 115:19 - 116:10, Mar. 14, 2007).

Jeffrey Tillotson, lead counsel for Bank One in *Hunter*, corroborates Martino's characterization of the negligent-design claim.  He testified that, "negligent design remained an issue in *Hunter* . . . only to the extent that open-ended financing plan, although lawful under *Benion*, provided more of an opportunity for [EAC's] salesman to lie to consumers."  (Tillotson Aff. 6).  At issue was not the legality of the financial product, but dealer misrepresentations imputed to Bank One under a theory of respondeat superior.  Thus, construing the facts in the light most favorable to Bank One, the purported negligent-design of the financial product does not absolve EAC from its duty to indemnify Bank One.

-28-

<u>iv.  Theory of Damages</u>

Contrary to EAC's assertion, the *Hunter* plaintiffs' theory of damages is further indicative of a genuine issue of material fact as to EAC's liability for the underlying claims.  The proposed measure of damages was simple: the difference between what a buyer would have paid under a closed-ended credit arrangement, as promised by EAC's dealers, and what buyers were obligated to pay under the open-ended credit plan. Martino delineated plaintiffs' theory of damages as follows:

> Q:     Was that also how you tied your damages theory to the salesperson's misrepresentations, because the salesperson had misrepresented it as closed end when, in fact, it was not?
>
> A:     And it wasn't - - it wasn't so much scientific or legal but common sense.  That was the way to sell it to the jury.  "Look, this what they said, let's just stick them to the bargain?"

(Martino Dep., 116:5 - 116:16, Mar. 14, 2007).  In other words, the *Hunter* plaintiffs' theory of damages was to enforce the financing agreement as EAC's dealers conveyed it to buyers.  That is, to stick Bank One with EAC's bargain.  As such, it does not negate EAC's indemnity obligation.  Ultimately, the *Hunter* plaintiffs' theory of both liability and damages is indicative of a genuine issue of material fact as to EAC's liability for the underlying claims.

## D.  ALLOCATION OF THE *HUNTER* SETTLEMENT

Alternatively, EAC contends that even if it is partly liable for *Hunter*, indemnification is unreasonable because the settlement does not disaggregate EAC's liability.  This argument has two strands.  First, EAC argues that the settlement does not separate EAC's liability from that of the other distributors, HCC and CSS.  Second, EAC contends that the settlement does not disaggregate EAC's liability from that of Bank One.

-29-

For both reasons, EAC contends that the settlement is an unreasonable basis for indemnification.

### 1. Estoppel

Bank One argues that the Court should not even reach the merits of EAC's allocation argument. Under Ohio law, an indemnitee who settles a claim bears the burden of showing that the settlement was fair and reasonable. *See Globe Indemnity*, 53 N.E.2d at 793. But Ohio courts typically preclude an indemnitor that unjustifiably repudiated its contractual obligation from objecting to the reasonableness of the settlement in the absence of a showing of fraud. *See Sanderson*, 635 N.E.2d at 22; s*ee also Andersons, Inc. v. Adam Wholesalers of Toledo, Inc.*, No. 98AP-1277, 1999 WL 715884 (Ohio Ct. App. Sept. 4, 1999) (holding that an indemnitor who refused to defend an indemnitee cannot later contend that the settlement is unfair and unreasonable); *Buckeye Ranch, Inc. v. Northfield Ins. Co.*, 839 N.E.2d 94, 111 (Ohio Com. Pl. 2005) (finding that an indemnitor, "[h]aving abandoned the [indemnitee], . . . cannot now complain that the settlement made was unreasonable or too costly"). Accordingly, Bank One urges the Court to estop EAC from objecting to the settlement.

EAC does not dispute the reasonableness of the settlement. Instead, EAC argues that the settlement is an unreasonable basis for indemnification because it fails to disaggregate EAC's liability. Contrary to Bank One's assertions, Ohio law does not bar an indemnitor from contesting the percentage of the settlement for which it is obligated. *See Stoller v. Fidelity & Guar. Ins. Underwriters, Inc.*, No. WD-87-64, 1988 WL 81809 (Ohio Ct. App. Aug. 5, 1988); *Owens Corning v. Nat'l Union Fire Ins. Co.*, 257 F.3d 484, 491 (6th Cir. 2000). Nor should it. By Bank One's rule, following repudiation,

-30-

courts would be bound to estop an indemnitor from challenging the proportion of the

settlement for which the indemnitor is contractually liable to pay.  As such, estoppel

would impede the allocation of damages in accordance with each party's contractual

obligations.  Ultimately, this rule would subvert the ex ante allocation of risk inherent in

indemnification agreements.

2. Method of Allocation

Neither the contract nor Ohio law sets forth a method of allocation.  Since the

Ohio Supreme Court has not yet addressed this issue, the Court must predict how it

would rule by looking at all available data, including appellate decisions.  *See Kingsley*

*Assocs., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995).  Each party

proposes a different rule for allocating the proportion of the settlement for which EAC

must indemnify Bank One.  Bank One argues that EAC is liable for the full amount

because it unjustifiably breached the contract.  EAC counters that it is not obligated to

indemnify Bank One for any amount because the *Hunter* settlement did not apportion

EAC's liability.  Both proposed rules offend the contract and general principles of

indemnification under Ohio law.

Bank One argues that because EAC shirked its duty to indemnify, EAC should be

liable for the full settlement as a matter of Ohio law.  Bank One relies solely on *Stoller v.*

*Fidelity and Guar. Ins. Underwriters, Inc.*, No. WD-87-64, 1988 WL 81809 (Ohio Ct.

App. Aug. 5, 1988), where an employee brought an intentional tort claim and a

negligence claim against his employer, the Village of Bradner.  *Id*. at 1.  United States

Fidelity and Guaranty Company ("USF & G") contracted to defend and indemnify the

Village for negligence, but not for intentional torts.  Upon inspecting the complaint, USF

-31-

& G denied coverage.  Subsequently, the parties settled.  *Id*. at 2.  The settlement, however, did not differentiate between payments for the negligence claim and for the intentional tort claim.  *Id*. at 5.

Unable to determine "whether the parties in the original action had allocated the consent judgment between claims," the trial court held USF & G liable for 50% of the settlement.  *Id*.  The trial court reasoned that since USF & G contracted to indemnify the Village for half of the claims at issue in the underlying lawsuit, it should be liable for half of the settlement.  *Id*.  Although the trial court noted that the insurer "should not be required to pay damages for injuries not covered by the policy," its Solomonic compromise of splitting damages in half regardless of whether they arose from the covered claims was ham-handed at best.  *Id*.  The appellate court reversed, holding that where an insurer wrongfully breached its duty to defend, it is "liable for the full amount of any reasonable settlement reached by the insured even where one claim is within the policy and one claim is outside the policy coverage."  *Id*. at 6.  Analogizing to this case, Bank One contends that EAC should be similarly liable for the full settlement.

*Stoller* is easily distinguishable from this case.  In *Stoller*, there was only one indemnitor.  Here, Bank One is entitled to indemnification from EAC, HCC, and CSS.  It would be both unjust and violative of the contract to hold EAC liable for the misconduct of other distributors.  Second, and more importantly, *Stoller* is premised on the fact that the trial court was unable to disaggregate covered claims from claims for which USF & G had no duty to indemnify.  *Id*.  Here, the Court is not so constrained.  As such, the *Stoller* rule is inapplicable.

EAC urges the Court to adopt a similarly austere rule.  EAC contends that *Owens Corning v. Nat'l Union Fire Ins. Co.*, 257 F.3d at 491, stands for the proposition that indemnification is per se improper for a settlement that does not allocate the amount of damages for which the indemnitor is contractually obligated.  This construction of *Owens Corning* is not persuasive.  Owens Corning had contracted with an insurer to indemnify it for director-officer liability.  *Id*.  Subsequently, the company settled a class action for $10 million in which it was as a co-defendant with its directors and officers.  *Id*. at 490.  Owens Corning then sued its insurer for indemnification of the full amount of the settlement.  *Id*.  The insurer demurred on the grounds that the settlement did not disaggregate director-officer liability from that of the corporation.  *Id*.

The Sixth Circuit applied the larger settlement rule, which permits allocation of the costs of the settlement "only where that settlement is larger because of the activities of uninsured persons who were sued or persons who were not sued but whose actions may have contributed to the suit."  *Id*. at 491 (*citing Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955, 960 (7th Cir. 1995)).  Finding that the directors were solely responsible for the underlying claims, the Sixth Circuit held that the insurer had a duty to indemnify Owens Corning for the full settlement.  *Owens Corning*, 257 F.3d at 491.

EAC reads *Owens Corning* to bar indemnification where the underlying settlement does not allocate claims.  But the Sixth Circuit held just the opposite.  *Owens Corning* sets forth a rule that "if the uninsured [party] made the settlement larger than it otherwise would have been with only the insured [ ] as defendants, allocation of the excess *can be made* and coverage *partially* denied."  *Id*. (emphasis added).  Although the

transaction costs may be high in parsing a settlement, the *Owens Corning* court defended

the practice as necessary to enforce the indemnification contract.

This case is analogous to *Owens Corning*. Bank One and EAC contracted such

that each would bear the risk of loss arising from their own misconduct. This was

particularly crucial to Bank One. Since it had no contact with consumers at the point of

sale, it was uniquely vulnerable to liability arising from dealer misconduct. The

indemnification provision was necessary to insure that dealers internalized the cost of any

misrepresentations intended to lure buyers into purchasing home satellite equipment.

The contract also contained mirror-image indemnification provisions, because

EAC did not want to bear the risk of liability arising from design or implementation of

Bank One's financial product. The effect of these provisions is clear. To the extent that

the underlying claims arise from EAC's actions, EAC must indemnify Bank One, and

vice versa. As such, the Court's allocation of the settlement must track this contractual

arrangement. *See Skivolocki v. East Ohio Gas Co.*, 313 N.E.2d 374, 376 (Ohio 1974)

(holding that Ohio courts must look to the plain language of an insurance contract to

ascertain the intent of the parties).

### 3. *Parsing the Settlement Agreement*

EAC argues that the amount, if any, for which it is liable is indeterminable so

long as the settlement agreement does not disaggregate liability or damages. EAC is

incorrect. It is not necessary for the settlement agreement to parse liability. It is only

necessary that this Court, or more accurately the fact-finder, be able to determine the

percentage of the settlement that should be allocated to EAC. In doing so, the court must

look to what was "seriously assumed by the settling parties to have been potentially

provable by the underlying claimants" at trial.  *Parker Hannifin Corp. v.  Steadfast Ins. Co.*, 445 F. Supp. 2d 827, 831 (N.D. Ohio 2006).

EAC's liability is easily disaggregated from that of HCC and CSS, the other distributors.  Bank One is suing EAC for indemnification of its pro rata share of the settlement.  Specifically, Bank One seeks indemnification for $3,543,601.88 that it paid directly to EAC customers.  Bank One also seeks indemnification from EAC for 79.5% of the attorneys fees, which is the proportion of class members that purchased satellite equipment from EAC.  As such, EAC's liability for the underlying claims is distinguishable from that of the other distributors.

EAC also argues that the settlement agreement does not allow a fact-finder to disaggregate EAC's liability from that of Bank One.  Based on Martino's testimony, the complaints of the Attorneys General of numerous states, and the affidavits of class members, there is a genuine issue of material fact as to whether EAC has a duty to indemnify Bank One for the *Hunter* settlement.  It is best left to the fact-finder to determine the proportion of the settlement for which EAC must indemnify Bank One.

### E.  TERMINATION OF EAC'S OBLIGATION

EAC argues that its duty to indemnify Bank One did not survive the expiration of the contract.  By mutual consent, the Credit Agreement expired on August 24, 1997.  The duty to indemnify, according to EAC, arose in March 2002, when the Tennessee court approved the *Hunter* settlement.  EAC contends that the termination clause of contract bars indemnification for judgments arising after the expiration of the agreement:

> Except as otherwise provided in this Agreement, and except in the case of any willful default, neither EAC nor Bank One shall have any obligations to the other hereunder following termination [of the contract].

-35-

Credit Agreement § 18(A).  EAC argues that pursuant to the termination clause, its duty

to indemnify Bank One dissolved with the contractual relationship.  As such, *Hunter*

arose too late to trigger EAC's duty to indemnify Bank One.

But EAC's argument is palpably flawed.  The termination clause explicitly

preserves EAC's duty to indemnify Bank One for losses arising from EAC's willful

breach of the Credit Agreement.  As discussed in detail above, the *Hunter* plaintiffs

alleged that EAC's dealers falsely conveyed the terms of the financing agreement.  If

true, such misrepresentations would constitute a willful breach of the Credit Agreement

under Ohio law.  *See  Shalash, Inc. v. Liquor Control Com'n*, No. 04AP-420, 2004 WL

2474420 (Ohio Ct. App. Nov. 4, 2004) (construing willful conduct as voluntary and

intentional, but not necessarily malicious).

More importantly, a superseding provision of the Credit Agreement preserves

EAC's duty to indemnify Bank One for the breach of any covenant prior to the expiration

of the agreement.  The catch-all survival clause of the Credit Agreement provides:

> All *obligations incurred or existing* under this agreement as of the
> date of termination or default, whether then known by either party to
> exist, and whether specifically referred to elsewhere herein or not,
> shall survive such termination or default.

Credit Agreement § 35(E).  The survival clause supersedes the termination clause relied

on by EAC, which begins "except as otherwise provided in this agreement."  Credit

Agreement §18(A).

Both the terms 'existed' and 'incurred' in the survival clause preserve EAC's

contractual obligation to indemnify Bank One for *Hunter* despite the expiration of the

agreement.  Under the plain and ordinary meaning of the contract, EAC's obligation to

-36-

indemnify Bank One for losses arising out of EAC's breach of the Credit Agreement *existed* as of the termination date. Moreover, EAC *incurred* the obligation to indemnify Bank One when EAC's dealers deceptively marketed Bank One's financial product in breach of the Credit Agreement. *See Blake Co. v. Chesapeake & Ohio Ry. Co.*, No 2897, 1927 WL 2664, at *2 (Ohio Ct. App. Feb. 21, 1927) (holding that a cause of action for breach of contract arose when defendant breached). Either way, the duty to indemnify Bank One survives the expiration of the contract.

## F. EXTINGUISHMENT OF CLAIMS

Finally, EAC avers that Ohio law precludes indemnification for a settlement that does not extinguish all potential claims against the indemnitor. In support, EAC relies on *Satterfield v. St. Elizabeth Health Center*, 824 N.E.2d 1047, 1049 (Ohio Ct. App. 2005), in which a hospital settled a malpractice claim and subsequently sought indemnification from an anesthesiology clinic. The court held that indemnification was improper, because the hospital's settlement did not extinguish plaintiff patient's claims against the anesthesiology clinic. *Id*. at 1051. The court reasoned that "it would be inequitable to allow indemnification since [indemnitor's] still could have been held liable for their own conduct in this dispute." *Id*. EAC extrapolates this principle: because the settlement did not extinguish the *Hunter* plaintiffs' claims against EAC, indemnification is similarly inappropriate.

But *Satterfield* is inapposite because the anesthesiologists' duty to indemnify the hospital arose by implication. Implied indemnification "occurs when one who is primarily liable is required to reimburse another who has *discharged* a liability for which that other is only secondarily liable." *Id*. (emphasis added) (c*iting Krasny-Kaplan Corp.*

-37-

*v. Flo-Tork, Inc.*, 609 N.E.2d 152 (1993)).  In this case, EAC's duty arose from a contract, not by implication in tort.  Thus, the terms of the bargain supersede the default rules for indemnification between tortfeasors.

The Credit Agreement makes no mention of extinguishment as a condition precedent for indemnification.  And rightly so.  From Bank One's perspective, it is irrelevant whether EAC's misconduct gave rise to other claims, yet to be litigated and beyond the scope of the settlement with Bank One.  Rather, the purpose of the indemnification clause is to recompense Bank One for losses arising from EAC's misconduct.  Therefore, the inquiry is merely whether EAC is culpable under the contract for *Hunter*.  Based on the analysis in the preceding sections, there is certainly a genuine issue of material fact as to EAC's liability such that summary judgment would be inappropriate.

Bank One, however, is not entitled to indemnification for claims that were not a part of the underlying action.  Although the *Hunter* settlement extinguished all claims against Bank One,[17] as part of the settlement agreement, the class assigned any potential

---

[17]The *Hunter* Final Order and Judgment provides:

All claims, rights, causes of action or choses in action, whether under state or federal or statutory or common law, including but not limited to claims arising under or pursuant to any state or federal law regarding consumer fraud or unfair or deceptive trade or business practices, or sounding in negligence, fraud misrepresentation, unjust enrichment, or otherwise, . . . that are, could have been, or might in the future have been asserted by Plaintiffs or any member of the Plaintiff Class . . . against Bank One . . .  are fully and finally compromised, settled, released, waived, relinquished, and discharged with prejudice . . ..  (¶ 8).

claims against EAC and other distributors to Bank One.[18]  Obviously, Bank One is not
entitled to indemnification for any assigned claims that were not a part of *Hunter*.  But
neither is EAC relieved of its duty to indemnify Bank One for *Hunter* because the
assigned claims are as yet unextinguished.

## G.  ECC'S LIABILITY

ECC guaranteed EAC's obligations.  As the Court finds a genuine issue of
material fact as to whether EAC has a duty to indemnify Bank One for the *Hunter*
settlement, it similarly refuses to grant summary judgment for ECC.

---

[18]The *Hunter* Final Order and Judgment provides:

> If and to the extent that any Plaintiff Class members have any Claims against
> one or more of the Seller, distributor, provider or manufacturer, or any agents
> of any of the foregoing, all such Claims are hereby fully, completely and
> irrevocably assigned to Bank One as part of the exchange for the
> undertakings and consideration provided by Bank One under the settlement.
> (¶ 9).

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is

**DENIED**.

      **IT IS SO ORDERED.**


             **s/Algenon L. Marbley**
             **ALGENON L. MARBLEY**
             **UNITED STATES DISTRICT JUDGE**

**DATED: November 26, 2007**